# STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## NO. 2023 CA 1290

### MICHAEL D. BRYANT

### VERSUS

### HELIX ENERGY SOLUTIONS, INC.

Judgment Rendered: __DEC 1 1 2024__

\* \* \* \* \*

On Appeal from the
19th Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Trial Court No. 619811

Honorable Wilson E. Fields, Judge Presiding

\* \* \* \* \*

| | |
|---|---|
| Johnny E. Dollar<br>James G. Buckley<br>Farmerville, LA | Attorneys for Plaintiff-Appellant,<br>Michael D. Bryant |
| James W. Bearden<br>Metairie, LA | |
| Brian E. Dollar<br>D. Brian Allen<br>Monroe, LA | |
| Charles A. Mouton<br>Richard J. Hymel<br>Jared L. Foti<br>Cynthia G. Sonnier<br>Lafayette, LA | Attorneys for Defendant-Appellee,<br>Helix Energy Solutions Group, Inc. |

\* \* \* \* \*

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

Chutz, J. concurs

**HESTER, J.**

In this matter, plaintiff-seaman filed suit against his employer under the Jones Act, seeking damages for injuries he sustained while working aboard a vessel. The suit was heard before a jury, and a judgment was signed on July 12, 2023, awarding damages to plaintiff. On appeal, plaintiff challenges the jury's allocation of fault as well as the amount of damages awarded. Defendant-employer answered the appeal also challenging the amount of damages awarded. For the following reasons, we amend the judgment to award damages for past medical expenses and, as amended, affirm the July 12, 2023 judgment.

## FACTS AND PROCEDURAL HISTORY

In June 2011, Michael Bryant was employed as an assistant crane operator for Helix Energy Solutions, Inc. ("Helix") and was working on Helix's oil field construction and intervention vessel known as the *Q4000* located in the Gulf of Mexico. Mr. Bryant arrived on the vessel in the afternoon of June 10, 2011, to begin a 28-day hitch.[1] In the early morning hours of June 11, 2011, Mr. Bryant was ascending a ladder from the deck of the vessel to the crane platform when his foot slipped causing him to fall and land on a lower ladder rung with his left leg. After he fell, Mr. Bryant felt dazed, but he was able to finish his work day. Over the next few days, he began to experience increasing pain that started going down the backside of his leg. Mr. Bryant twice went to the medic on the vessel, and on the morning of June 15, 2011, he was transported by helicopter to Pelican State Outpatient Center in Harahan, Louisiana to seek further medical treatment. At Pelican, he was examined by two physicians who x-rayed his knee and lower back, advised him to continue taking Tylenol and ibuprofen, and referred him for further evaluation at home.[2]

---

[1] A hitch refers to the specific period of time an employee works consecutively.
[2] At that time, Mr. Bryant lived in Marion, Louisiana.

On June 29, 2011, Mr. Bryant had an appointment with an orthopedic surgeon, Dr. Douglas Brown. Dr. Brown examined Mr. Bryant and reviewed an MRI of Mr. Bryant's back, which revealed a ruptured disc at the L5-S1 level of his lower back on the left side that was compressing his nerve root. Dr. Brown recommended surgery, and on July 6, 2011, Dr. Brown performed a microdiscectomy on Mr. Bryant.

On June 5, 2012, Mr. Bryant filed a "Petition for Damages" naming Helix as defendant and contending that Helix was negligent under the Jones Act for failing to provide him with a safe environment in which to perform his employment duties because scaffolding erected directly behind the crane ladder caused Mr. Bryant to slip, and Helix knew or should have known that the scaffolding created "a trip or slip hazard" to employees ascending or descending the ladder. In his petition, Mr. Bryant sought damages for the injuries he sustained on June 11, 2011, as well as punitive damages for Helix's failure to continue to pay maintenance and cure benefits.[3]

From January 23, 2023 through January 27, 2023, this matter was tried before a jury.[4] At the conclusion of the trial, the jury returned a verdict finding Helix 60% at fault and Mr. Bryant 40% at fault and awarding Mr. Bryant $85,000.00 for past pain and suffering, $50,000.00 for past lost wages, and $20,000.00 for future medical expenses. The jury awarded no damages to Mr. Bryant for future pain and suffering or past medical expenses. Thereafter, Mr. Bryant filed a motion for judgment notwithstanding the verdict (JNOV). The trial court granted the JNOV in part, awarding Mr. Bryant $40,000.00 in future pain and suffering. A judgment in conformance with the jury verdict and partial JNOV was signed on July 12, 2023, in

---

[3] Initially, Mr. Bryant filed suit in the Fourth Judicial District Court. The matter was transferred to the Nineteenth Judicial District Court by a judgment signed on January 16, 2013.

[4] During the trial, several witnesses testified via video depositions that were played for the jury.

favor of Mr. Bryant and against Helix in the amount of $117,000.00. Mr. Bryant appealed from this judgment asserting the following assignments of error:

1. The allocation of comparative fault was not supported by the evidence.

2. The award of damages was inadequate in every category except future medical expenses and the additional award of $40,000.00 for future pain and suffering by JNOV was inadequate.

3. Wrongful termination of Maintenance and Cure was res judicata, collaterally estopped and the jury should have been so instructed and should have awarded damages accordingly. The trial court erred in failing to so instruct the jury.

Helix answered Mr. Bryant's appeal contending that there was insufficient evidence for the jury to award future medical costs or expenses, and the trial court improperly granted Mr. Bryant's JNOV and awarded future general damages (future pain and suffering) based upon the jury's erroneous award of future medical expenses.

## LAW AND ANALYSIS

### *Allocation of Fault*

In his first assignment of error, Mr. Bryant contends that the jury erred in allocating any fault to him because his injury was caused by him stepping on scaffolding abutting the inside of the ladder rung, which caused him to slip, and he had previously reported the scaffolding as a safety hazard.

State appellate courts sitting in maritime cases apply state standards of review. **Thomas v. Department of Wildlife & Fisheries**, 2018-0869 (La. App. 1st Cir. 10/2/19), 289 So.3d 579, 587, <u>writ denied</u>, 2019-01767 (La. 1/14/20), 291 So.3d 687. Louisiana appellate courts apply the manifest error-clearly wrong standard of review of facts in general maritime and Jones Act cases. **Thomas**, 289 So.3d at 587. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trier of fact; and 2) whether the record further establishes that the finding is not manifestly erroneous. **Mart v. Hill**, 505 So.2d 1120, 1127 (La. 1987). Thus, if there is no reasonable

4

factual basis in the record for the trier of fact's finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a factual finding only if, after reviewing the record in its entirety, it determines the factual finding was clearly wrong. See **Stobart v. State, through Dep't of Transp. and Dev.**, 617 So.2d 880, 882 (La. 1993). If the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. **Thomas**, 289 So.3d at 588. Like all factual findings, the standard of review of comparative fault allocations is that of manifest error. **Laborde v. St. James Place Apartments**, 2005-0007 (La. App. 1st Cir. 2/15/06), 928 So.2d 643, 647.

The Jones Act allows an injured seaman to bring a negligence suit against his employer. 46 U.S.C. § 30104. The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery. **Foster v. Destin Trading Corp.**, 96-0803 (La. 5/30/97), 700 So.2d 199, 208. Such negligence may arise in many ways, including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. **Zentner v. Seacor Marine, Inc.**, 2006-2049 (La. App. 1st Cir. 10/24/07), 977 So.2d 962, 965. The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely, the duty to take reasonable care under the circumstances. See **Gautreaux v. Scurlock Marine, Inc.**, 107 F.3d 331, 336 (5th Cir. 1997) (en banc). The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. **Foster**, 700 So.2d at 208. A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances. The circumstances of a seaman's employment

include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. The reasonable person standard in a Jones Act negligence action becomes that of the reasonable seaman in like circumstances. See **Derouen v. Mallard Bay Drilling, LLC**, 2000-1268 (La. App. 1st Cir. 6/22/01), 808 So.2d 694, 702. The employer can introduce evidence of the seaman's own negligence to reduce damages through application of pure comparative fault principles. To prove comparative negligence on the part of the plaintiff, the defendant has to show that the plaintiff was contributorily negligent and that such negligence was a proximate cause of the resulting injury. **Derouen**, 808 So.2d at 704. If a seaman's negligence contributes to his injury, his "contributory negligence will not bar his recovery, but may reduce the amount of damages owed proportionate to his share of fault." **Jauch v. Nautical Services, Inc.**, 470 F.3d 207, 213 (5th Cir. 2006). Like his employer, the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the same circumstances. **Gautreaux**, 107 F.3d at 339.

Herein, Mr. Bryant testified about how his injury occurred. He said that in between the crane pedestal and the back side of the crane ladder there was scaffolding built around the crane pedestal. According to Mr. Bryant, the scaffolding, which had no skid protection, was about 2 ½ inches above the ladder rung and was "pretty much abutting to the rung or very close." He said he slipped when he stepped on the scaffolding brace rather than the ladder rung. Mr. Bryant testified that he did not initially report the incident because he "really wasn't sure that anything really happened at that time."

Mr. Bryant said that the scaffolding had been up for about sixty days in order to paint the crane pedestal and was up his entire 28-day hitch before the accident

6

happened. Mr. Bryant testified that during his previous hitch he went to the bosun[5] and asked him to take a look at the scaffolding and see if he could talk to the captains about it, but the scaffolding never came down.

On cross-examination, Mr. Bryant acknowledged that he had to fill out a Crane Pre-Use Checklist Form every day and submit the form to the superintendent, and he never filed a report regarding the scaffolding. He said that he filled out multiple Job Safety Analyses (JSA) for different tasks to identify any hazards that might affect his ability to work in a safe way. He agreed that he never filled out a JSA listing the scaffolding as a hazard. Mr. Bryant reviewed the JSA from June 11, 2011, which he signed, and he noted that the JSA gave him the authority to stop working if he thought the job was going to be unsafe. Mr. Bryant acknowledged that, with the scaffolding erected next to the ladder, he "accessed the ladder numerous times without [anything] happening." Chad Green, who worked for Helix from 2007 to 2016, testified that he also slipped on the scaffolding. He said he told someone about the scaffolding, and that it needed to be fixed, but he couldn't remember who he told.

In the days following his accident, Mr. Bryant described what occurred as a "misstep" to his coworkers. He also described it as a "misstep" when he went to the medic on the vessel for the second time. Mr. Fred Scudgins, a consultant working with Helix, did a recorded interview with Mr. Bryant on June 16, 2011. Mr. Bryant told Mr. Scudgins that he had a misstep on the ladder and fell. When Mr. Bryant described to Mr. Scudgins what happened, he said a couple of the scaffolding were kind of uneven from the steps, and he slipped and fell on one of them. Mr. Bryant estimated that he slipped about fourteen inches. Mr. Scudgins asked if there was an obstruction that caused him to slip, and Mr. Bryant answered, "No." Next Mr.

---

[5] Mr. Bryant described the Bosun as "the supervisor, the foreman of the marine crew."

7

Scudgins asked if basically he just misstepped and Mr. Bryant responded, "yeah, that's all it was". During trial, Mr. Bryant testified that he was not truthful with Mr. Scudgins during that interview because he was trying to keep things "lowkey" so that the incident would not be considered a lost times accident that could cause the whole crew on the vessel to lose their safety bonus.

Under the Jones Act, Helix had the duty to use reasonable care to provide a seaman with a safe place to work. As a seaman, Mr. Bryant was obligated under the Jones Act to take reasonable care and act with ordinary prudence under the circumstances. To prove comparative negligence on the part of Mr. Bryant, Helix had to show that Mr. Bryant was contributorily negligent and that such negligence was a proximate cause of the resulting injury. As noted, where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Herein, the credible evidence supports the jury's conclusion that Mr. Bryant was also negligent, and his negligence was a contributing cause of his injuries. Mr. Bryant acknowledged that he had traversed the ladder without incident many times with the scaffolding in place, and he had the authority to stop working if he thought the job was going to be unsafe. While Mr. Bryant mentioned the scaffolding to the bosun, he never indicated it being an obstruction in any of the JSAs, Crane Pre-Use Checklist, or post-incident interview. In reviewing the record in its entirety, and considering the deference owed to the jury's findings, we find no error in the jury's allocation of 40% of the fault to Mr. Bryant.

*Damages Award*

In his second assignment of error, Mr. Bryant contends that the jury's awards of $85,000.00 for past pain and suffering, $50,000.00 for past lost wages, nothing for past medical expenses, and nothing for wrongful termination of maintenance and cure as well as the trial court's award of $40,000.00 for future pain and suffering

8

after the JNOV were woefully inadequate. In its answer, Helix contends that the jury erred in awarding $20,000.00 for future medical expenses, and the trial court erred in awarding $40,000.00 in future pain and suffering.

The following is a summary of Mr. Bryant's accident, life post-accident, and medical and work history based on the testimony given and evidence introduced. A little over a week after Mr. Bryant fell on the ladder, on June 29, 2011, he was brought into Dr. Brown's office in a wheelchair in immense pain. Dr. Brown performed a microdiscectomy on Mr. Bryant on July 6, 2011, and Mr. Bryant said that after the surgery, he felt instant relief, but he was not the same as he was before the surgery.

Dr. Brown testified about his treatment of Mr. Bryant. He said that Mr. Bryant progressed well post-surgery, and came into his office about two months post-surgery on September 19, 2011, and was walking well, his neurological exam was normal, his muscle tone was good, and Mr. Bryant told Dr. Brown that he had no pain at all. At that point, Dr. Brown released Mr. Bryant to return to work. According to Dr. Brown, two days later, on September 21, 2011, Mr. Bryant returned to Dr. Brown's office and said that he needed pain medication to do his job because when he was standing too long, he experienced pain in his back. At this point, Dr. Brown rescinded Mr. Bryant's return to work and suggested a functional capacity test ("FCE") because Mr. Bryant could not return to work in the same capacity if he remained on his pain medication. Mr. Bryant completed the FCE, which determined that Mr. Bryant continued to have radicular symptoms with both pain and muscle weakness, but also determined that he was able to tolerate a light to medium workload. On January 12 and February 1, 2012, Dr. Brown performed epidural steroid injections ("ESIs") on Mr. Bryant in an effort to improve his pain. Thereafter, Dr. Brown referred Mr. Bryant to a local neurosurgeon, Dr. McHugh.

On February 29, 2012, Dr. Brown signed a Statement of Maximum Medical Improvement finding that Mr. Bryant had reached maximum medical improvement ("MMI"). Dr. Brown testified regarding the signing of that statement stating, that although he thought Mr. Bryant needed more treatment, he had reached maximal treatment that he could provide for Mr. Bryant. Later, on May 30, 2012, Mr. Bryant's counsel prepared a document outlining Mr. Bryant's condition at that time. Dr. Brown signed the document indicating that, in light of the information discussed in the document, it was his opinion that further medical treatment of Mr. Bryant should be continued.

On September 28, 2012, Mr. Bryant had an appointment with general practitioner Dr. Paul Watson because he was continuing to have some pain. Thereafter, Mr. Bryant introduced evidence of March 3, 2014 and December 4, 2014 appointments with Dr. Watson to have his pain medication prescription refilled as he was experiencing pain. Mr. Bryant did not provide evidence of seeking any medical treatment between September 2012 and March 2014.

After Mr. Bryant was released by Dr. Brown and no longer receiving benefits from Helix, he sought new employment. Mr. Bryant applied with Noble Drilling Corporation ("Noble") and was required to undergo a full physical on July 3, 2012. Anna Marie Petry, an occupational therapist, performed the physical on Mr. Bryant to determine if he could safely and efficiently perform the job duties. Mr. Bryant reported his July 6, 2011 surgery to Ms. Petry, and stated that he had not had any issues since the surgery, and he was able to work without restriction. Before Ms. Petry started the testing, Mr. Bryant filled out a form checking, "yes" that he was not having any pain or discomfort. As part of the physical, Noble used the B-200 Isoinertial Back Evaluation to test Mr. Bryant's strength and endurance levels. Mr. Bryant's results showed no back dysfunction and no abnormal indicators. After the three-hour physical, Ms. Petry found that Mr. Bryant did very well and that she did

not see any limitations for Mr. Bryant. Mr. Bryant passed the physical to work for Noble at a medium-level capacity. Mr. Bryant began working for Noble in August 2012 with a base salary of $88,000.00, but he testified that he was making "significantly more" since he was overseas.

Mr. Bryant left Noble in November 2013 to begin working for Seadrill Americas Inc. ("Seadrill") because "Seadrill was paying a little more money." Before he could begin working for Seadrill, Mr. Bryant had to undergo another physical. His physical was performed by Mr. Terry Wilson, a physician's assistant. Mr. Bryant reported to Mr. Wilson that he did not have any low back pain or radiating symptoms in his lower extremities. Mr. Richard Kraeer, a drilling section leader with Seadrill, testified that while with Seadrill, Mr. Bryant was able to perform all of his duties and did not complain to him of any pain. He said Mr. Bryant was required to climb numerous stairs daily. Mr. Kraeer also noted that Mr. Bryant was required to undergo an updated Coast Guard physical every two years, and he was found able to perform the items listed in the instruction table. Mr. Bryant worked for Seadrill until 2017.

In 2015, Mr. Bryant returned to Dr. Brown with low back pain, and Dr. Brown transferred him to Dr. Scott Blumenthal, an orthopedic spine surgeon at the Texas Back Institute. On May 19, 2015, Dr. Blumenthal performed an artificial disc replacement, and on March 21, 2017, and April 17, 2018, Dr. Blumenthal performed microdiscectomies on Mr. Bryant as he was experiencing lower back pain and left leg pain. Dr. Blumenthal testified regarding his treatment of Mr. Bryant. Helix's attorney asked Dr Blumenthal, "I didn't see anywhere in your records where you suggest that Mr. Bryant had—that L4-5 level where you saw him in 2016 was associated with his prior treatment" and he answered "correct".

In December 2018, Mr. Bryant saw Dr. C. Chambliss Harrod, an orthopedic spine surgeon, complaining of back pain and neck pain that was radiating to his right

11

arm. Dr. Harrod placed a plate in Mr. Bryant's neck. Dr. Harrod also testified regarding his treatment of Mr. Bryant. Dr. Harrod agreed that once a disc becomes herniated it tends to become degenerative quicker than had it not been injured. He also was asked on cross whether he would relate Mr. Bryant's neck pain back to a 2011 incident if that neck pain began in July or August of 2018. In response, Dr. Harrod agreed that if that was the case, he would not relate it to the 2011 incident.

Helix played for the jury surveillance video of Mr. Bryant from October 2011 until February 2012. In the videos, Mr. Bryant appears to be walking without difficulty. A video from August 2012, shows Mr. Bryant spending the day fishing, which included washing his boat, bending down multiple times to work on something under his motor, and launching his boat by pulling the boat by a rope once it was in the water. In another video he is shopping with his family, often bending down to retrieve items on the bottom aisle. Finally, in another video, Mr. Bryant appears to be dressed for hunting, and in the video he carries large bags of ice and, with the help of a friend, lifts a large ice chest into the back of a truck.

Mr. Bryant testified regarding his medical treatment, current pain level, and salary. Mr. Bryant said that he had to return to work to make ends meet because Helix stopped paying him. He stated that he did not tell Noble he was in pain because he needed a job. He testified that the cranes on the Noble and Seadrill vessels were state of the art, and he was not required to do any heavy lifting while working for either company. Mr. Bryant said that he currently has muscle spasms if he sits too long. He testified that he has good days and bad days and is still on prescribed medication. He said the hardest part of the last ten years has been not being able to do things with his kids that he used to do. He also said he could not hunt or do manual labor like he used to. Mr. Bryant estimated that his lost wages were around $320,000.00, and his medical expenses were around $250,000.00.

12

Helix paid for Mr. Bryant's July 6, 2011, microdiscectomy and all of Mr. Bryant's medical expenses until March 2012, after Dr. Brown determined that Mr. Bryant had reached MMI. At the beginning of September 2011, Helix stopped paying Mr. Bryant's full salary and switched to maintenance, which Helix paid through February 2012.

Considering the foregoing evidence, we review the awards of the jury and the trial court after the JNOV.

$85,000.00 for Past Pain and Suffering and $40,000.00 for Future Pain and Suffering

General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms. **Jones v. Market Basket Stores, Inc.,** 2022-00841 (La. 3/17/23), 359 So.3d 452, 464. The role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. **Id.**

The trier of fact, whether judge or jury, has much discretion in the assessment of damages. La. Civ. Code art. 2324.1. This discretion, however, is not unfettered. **Pete v. Boland Marine and Manufacturing Company, LLC**, 2023-00170 (La. 10/20/23), 379 So.3d 636, 641. The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its much discretion in assessing the amount of damages. **Pete,** 379 So.3d at 638-39.

Recently, the supreme court revisited the question of how appellate courts are to review general damage awards. In **Pete,** the supreme court stated that the inherently subjective nature of the abuse of discretion standard in the context of reviewing general damage awards compelled that some measure of objectivity be incorporated into the determination of an award's reasonableness, so that there is

13

some standard for comparison. The supreme court therefore held that an appellate court must consider relevant prior general damage awards as guidance in determining whether a trier of fact's award is an abuse of discretion. Before this decision, appellate courts considered relevant prior damage awards only after finding an abuse of discretion, a method which the supreme court found overly subjective and, as a result, meaningless. **Pete**, 379 So.3d at 638-39, 643.

The supreme court explained that a review of prior awards is a starting point in evaluating whether a general damage award is an abuse of discretion, since courts must also consider the specific facts and circumstances of each case. Specifically, the court explained:

> We do not abandon the two-step analysis for the appellate review of a general damage award but modify the analysis as follows. The question of whether the trier of fact abused its discretion in assessing the amount of damages remains the initial inquiry. However, to evaluate this issue, an appellate court is to include a consideration of prior awards in similar cases, as well as the particular facts and circumstances of the case under review. If an abuse of discretion is found, the court is to then also consider those prior awards to determine "the highest or lowest point which is reasonably within that discretion."

**Pete**, 379 So.3d at 644 (citation omitted).

Furthermore, the general rule is that a jury commits legal error in awarding special damages for medical expenses while at the same time denying general damages. **Willis v. Noble Drilling (US), Inc.**, 11-598 (La. App. 5th Cir. 11/13/12), 105 So.3d 828, 845. While it is still true that "a jury verdict awarding medical expenses but simultaneously denying damages for pain and suffering will most often be inconsistent in light of the record," it cannot be concluded that such a perceived inconsistency always amounts to legal error. See **Wainwright v. Fontenot**, 2000-0492 (La. 10/17/00), 774 So.2d 70, 75. Herein, the jury, in awarding future medical expenses, clearly determined Mr. Bryant still had lingering medical issues related to the June 11, 2011 accident. Therefore, it was inconsistent to award Mr. Bryant nothing for future pain and suffering. In light of the record, we agree with the trial

14

court's grant of the JNOV to award Mr. Bryant $40,000.00 in future pain and suffering. Thus, in accordance with the supreme court's decision in **Pete**, we review prior awards in similar cases, as well as the particular facts and circumstances of this case and the total award of $125,000.00 ($85,000.00 + $40,000.00) to Mr. Bryant for general damages.

In **Howard v. Norton**, 2019-0565 (La. App. 1st Cir. 6/12/20), 2020 WL 3109388, a plaintiff involved in a rear-end motor vehicle accident was diagnosed with disc herniations at the L4-L5 and L5-S1 levels and underwent a spinal fusion and three steroid injections. This court affirmed the jury's general damage award for $90,000.00 ($50,000 for past and future physical pain and suffering, $30,000 for mental anguish, and $10,000 for loss of enjoyment of life).

In **Ober v. Champagne**, 14-170 (La. App. 5th Cir. 12/16/14), 166 So.3d 254, writ denied, 2015-0332 (La. 4/24/15), 169 So.3d 361, the appellate court determined that an award of $190,000.00 for past and future physical pain and suffering was not an abuse of discretion where the plaintiff motorist suffered a herniated L4-L5 disc and a tear in his shoulder as result of an accident. The plaintiff underwent surgery on his shoulder, and like Mr. Bryant, underwent a microdiscectomy. The plaintiff said his back pain continued and the doctor described his condition as chronic. The plaintiff could not return to work, faced a spinal fusion in the future, and also suffered from erectile dysfunction, which affected his relations with his wife.

In **Fontenot v. UV Ins. Risk Retention Grp., Inc.**, 2020-0361, 2020-0362 (La. App. 3rd Cir. 4/14/21), 359 So.3d 36, 54-55, writ denied, 2021-00656 (La. 10/5/21), 325 So.3d 357. The appellate court determined that an award of $150,000.00 for past, present, and future physical pain and suffering was the lowest reasonable amount within the trier of fact's discretion where following a rear-end accident, the plaintiff driver required two surgeries: a cervical discectomy and fusion surgery on three levels.

15

In this case, the jury heard evidence that Mr. Bryant experienced great pain in the days following his June 11, 2011 accident, but he felt instant relief after Dr. Brown performed the July 6, 2011 microdiscectomy. Although Mr. Bryant acknowledged instant relief, he stated that he was not the same as he was before the accident. Mr. Bryant also underwent two ESI's administered by Dr. Brown in early 2012. Soon after that, there was a significant gap in medical treatment from September 28, 2012 until March 3, 2014, and Mr. Bryant did not return to Dr. Brown regarding his back until early 2015. During that time, Mr. Bryant underwent a thorough physical with Noble in July 2012 where he passed the physical to work in a medium level capacity, and during the physical Mr. Bryant reported not being in pain. Additionally, Mr. Bryant underwent a separate physical for Seadrill in November 2013 and again was found able to work and reported to Seadrill that he was pain free.

Mr. Bryant described his accident as a misstep to multiple people in the immediate aftermath, and he told Mr. Scudgins that he fell 14 inches. The jury viewed surveillance video of Mr. Bryant's daily activities from October 2011 until February 2012. The jury was presented this evidence juxtaposed to Mr. Bryant's testimony that the injury limited what he was able to do and that he has been in pain for the last ten years. In view of the prior general damage awards in similar cases, as well as the particular facts and circumstances of the case, we find the general damage award of $125,000.00, while on the low end of reasonable awards, was not an abuse of discretion.

$50,000.00 for Past Lost Wages

A plaintiff seeking damages for past lost wages bears the burden of proving lost earnings, as well as the duration of time missed from work due to the accident. The trier of fact has broad discretion in assessing awards for lost wages, but there must be a factual basis in the record for the award. Where there is no basis for a

precise mathematical calculation of a past lost wage claim, the trier of fact can award a reasonable amount of damages without abusing his discretion. **Cotton v. State Farm Mutual Automobile Insurance Company**, 2010-1609 (La. App. 1st Cir. 5/6/11), 65 So.3d 213, 224, <u>writ denied</u>, 2011-1084 (La. 9/2/11), 68 So.3d 522.

Mr. Bryant had the burden of proving his lost earnings, as well as the duration of time missed from work due to the accident. During his testimony, Mr. Bryant was asked what he estimated his lost wages were from 2011-2018. He responded around $320,000.00. He testified that he made about $120,000.00 a year with Helix, but did not introduce any documentary evidence. Helix introduced Mr. Bryant's 2009-June 2011 earnings with Helix as well as Bryant's tax returns from 2011-2018. In the pay period ending on December 25, 2010, Mr. Bryant's year to date gross pay totaled $104,928.38. In the pay period ending on July 23, 2011, Mr. Bryant's year to date gross pay totaled $58,325.67.

Helix paid Mr. Bryant's full salary until September 2011; in March 2012, Dr. Brown found Mr. Bryant had reached MMI; and in August 2012, Mr. Bryant started working again making more than $88,000.00 and working in a similar capacity that he did at Helix. Mr. Bryant continued to work consistently until his employment with Seadrill ended in 2017. Considering Mr. Bryant's testimony that he made approximately $120,00.00 a year as well as the documentary evidence regarding Mr. Bryant's salary presented by Helix which was reasonably consistent with Mr. Bryant's testimony, it appears that the jury determined that Mr. Bryant proved he was entitled to past wages due to the accident for approximately five months, i.e., $120,000.00/12 x 5=$50,000. In reviewing the documentary evidence regarding Mr. Bryant's income introduced by Helix, the lack of corroborating evidence introduced by Mr. Bryant, and Mr. Bryant's burden of proof, we find the jury's award of

17

$50,000.00 for past wages to be reasonable, and therefore, is not an abuse of discretion.

<u>$20,000.00 for Future Medical Expenses & Zero for Past Medical Expenses</u>

Special damages are defined as those that must be specially pled or that have a "ready market value;" in other words, the amount that supposedly can be determined with relative certainty. **Wainwright**, 774 So.2d at 74. The plaintiff's past medical expenses incurred as a result of a tort are considered special damages. **Id.** The test for determining the causal relationship between the accident and subsequent injuries is whether the plaintiff proved, through medical testimony, that it was more probable than not that the subsequent injuries were caused by the accident. **Mann v. Louisiana-1 Gaming**, 2021-83 (La. App. 5th Cir. 12/15/21), 334 So.3d 894, 900. An award of special damages is reviewed for manifest error. <u>See</u> **Kaiser v. Hardin**, 2006-2092 (La. 4/11/07), 953 So.2d 802, 810.

The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence the future medical expense will be medically necessary. **Menard v. Lafayette Ins. Co.**, 2009-1869 (La. 3/16/10), 31 So.3d 996, 1006; **Waters v. Hebert**, 2019-0435 (La. App. 1st Cir. 11/20/19), 291 So.3d 278, 282. Further, a plaintiff must establish that future medical expenses will more probably than not be incurred. **Menard**, 31 So.3d at 1006.

An award for future medical expenses is, in great measure, highly speculative, not susceptible to calculation with mathematical certainty, and generally turns on questions of credibility and inferences. An award of future medical expenses is justified if there is medical testimony that they are indicated and that sets out their probable cost. **Holliday v. United Services Auto. Ass'n**, 569 So.2d 143, 146 (La. App. 1st Cir.1990).

Herein, Dr. Brown, was asked what would be expected in the form of future medical care for Mr. Bryant, and he discussed the possibility of a future surgery as

18

well as a need for pain medication or strong anti-inflammatory medicine. Mr. Bryant testified that he was still currently on prescription medication. In awarding damages for future medical expenses, the jury clearly determined that some future treatment for Mr. Bryant's back was necessary and related to the June 11, 2011 accident. With the medical testimony of Dr. Brown as well as the testimony of Mr. Bryant, we find there was sufficient evidence to justify the jury's award of $20,000.00 for future medical expenses.

However, in considering the jury awards, we find it difficult to determine the factual conclusions of the jury based on the jury verdict form. Since the jury awarded nothing for past medical expenses, it appears that the jury determined that Mr. Bryant's post March 2012 medical treatment, once Helix stopped paying for medical treatment, was not related to Mr. Bryant's June 11, 2011 accident. However, the jury awarded $20,000.00 for future medical care. These jury awards are internally inconsistent in light of the record as the jury awarded no damages for past medical expenses from March 2012 until the trial for the same injury for which the jury awarded some future medical costs.

If the factual findings are manifestly erroneous or clearly wrong such that a plaintiff is entitled to an award for a particular category of damages, and the jury fails to make such an award, the reviewing court is to perform a *de novo* review of the record and make an award. See **Green v. K-Mart Corp.**, 2003-2495 (La. 5/25/04), 874 So.2d 838, 844. Based on our review of the record, we reverse the jury on this issue and award past medical expenses. After Helix stopped paying for Mr. Bryant's medical care, and before he returned to Dr. Brown in 2015, he had at least three appointments with Dr. Watson complaining of back pain, and twice seeking a refill of his tramadol prescription. With this evidence, we find appropriate an award of past medical expenses for Mr. Bryant for his three appointments with Dr. Watson and his prescriptions for Tramadol in the amount of $1,500.00. In so

19

ruling, we note that while there was some expert testimony stating that it was possible that the June 11, 2011 accident could have caused quicker degeneration of the disc in Mr. Bryant's back, the record was devoid of medical testimony directly connecting Mr. Bryant's 2015-2019 back and neck surgeries to the June 11, 2011 accident. Therefore, we did not award damages for past medical expenses to Mr. Bryant for his 2015 and later surgeries.

Termination of Maintenance and Cure

Mr. Bryant argued that the jury erred in finding that Helix did not willfully and wantonly wrongfully terminate Mr. Bryant's maintenance and cure benefits. "Maintenance and cure" is a duty imposed upon the owner of a ship to provide food, lodging, and necessary medical services to seamen who become ill or injured during service to the ship. **Comeaux v. Basin Marine, Inc.**, 93-1624 (La. App. 1st Cir. 6/24/94), 640 So.2d 833, 836, writ denied, 94-2307 (La. 11/18/94), 646 So.2d 386. Cure is payment of the seaman's medical, therapeutic, and hospital expenses, until that point in time when plaintiff reaches maximum medical recovery. **Fox v. Texaco, Inc.**, 97-2126 (La. App. 1st Cir. 11/6/98), 722 So.2d 1064, 1067. A ship owner who arbitrarily and capriciously denies maintenance and cure to an injured seaman is liable to him for punitive damages and attorney's fees. The behavior necessary for such a penalty has been described as "callous and recalcitrant, arbitrary and capricious" and "willful, callous, and persistent." **Miller v. International Diving and Consulting Services, Inc.**, 95-873 (La. App 5th Cir. 2/14/96), 669 So.2d 1246, 1260.

In March 2012, Helix filed in federal court seeking a declaratory judgment to terminate maintenance and cure payments to Mr. Bryant. Mr. Bryant responded requesting that Helix's motion be dismissed. Around one year later, on March 21, 2013, the federal court signed an order granting Mr. Bryant's motion to dismiss Helix's declaratory judgment stating as follows:

20

> The evidence shows that [Dr. Brown] attested on May 29, 2012[6] that [Mr. Bryant] is in need of further medical treatment, rescinding his prior finding of [Mr. Bryant] reaching maximum medical improvement. Additionally, the plaintiff filed suit against [Helix] in [district court] on June 5, 2012. In light of this evidence, the Court finds the Motion to Dismiss is properly granted and the instant suit is dismissed with prejudice.

Mr. Bryant argues that Helix terminating maintenance and cure payments despite the federal court ruling proves that Helix was arbitrary and capricious and wrongfully terminated his maintenance and cure payments.

As noted, Helix stopped paying Mr. Bryant's full salary in September 2011 and switched to maintenance and cure payments, which Helix paid through February 2012. Helix paid Mr. Bryant's medical expenses through March 2012 when Dr. Brown determined that Mr. Bryant had reached MMI. The federal court ruling was admitted into evidence and considered by the jury. Jason Shropshire, who at the time of Mr. Bryant's accident was a risk manager for Helix, testified about his decision to terminate Mr. Bryant's maintenance and cure payments. He said he ended payments when Dr. Brown released Mr. Bryant to return to work, and he did not resume payments after receiving the federal court ruling because Helix's investigator had videos of Mr. Bryant hunting, pulling a boat, remodeling a home, and installing some heavy appliances during that time; he was aware of deposition testimony of Dr. Brown stating that Mr. Bryant was at MMI based on the circumstances described by Helix; there was a FCE performed that determined Mr. Bryant could go back to medium level duties; and he was aware that Mr. Bryant passed the pre-employment Noble physical performed in July 2012. Mr. Shropshire agreed that he looked at all the medical evidence and testimony from Dr. Brown, the therapist, and the pre-employment examiners and believed that no additional maintenance and cure benefits were owed.

---

[6] This was based on the letter written by Mr. Bryant's attorney signed by Dr. Brown stating that further medical treatment of Mr. Bryant should be continued.

As noted, the behavior necessary for an award of punitive damages for the arbitrary and capricious failure to pay maintenance and cure has been described as willful, callous, and persistent. Herein, the jury was presented with the judgment from the federal court as well as Mr. Shropshire's testimony describing his decision to terminate payments to Mr. Bryant and not resume payments when he received the federal court ruling. Considering the evidence presented, we find it was well within the jury's discretion to conclude that Helix was not arbitrary and capricious in its decision to terminate Mr. Bryant's maintenance and cure payments.

### *Maintenance and Cure*: *Jury Instructions*

In his final assignment of error, Mr. Bryant contends that the trial court erred in not instructing the jury that the March 21, 2013 federal court ruling denying Helix's request for a declaratory judgment had a res judicata and collateral estoppel effect finding MMI of Mr. Bryant had not been reached. It is well settled that a party may not assign as error the giving or failure to give a jury charge unless he timely objects to the charges. La. Code Civ. P. art. 1793(C). Louisiana Code Civil Procedure art. 1793(C) provides:

> A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.

However, courts have held that where the jury instructions contain a "plain and fundamental" error, the contemporaneous objection requirement is relaxed and appellate review is not prohibited. **Berg v. Zummo**, 2000-1699 (La. 4/25/01), 786 So.2d 708, 716, n. 5.

Mr. Bryant never requested the trial court to instruct the jury as to the preclusive effect of the federal court ruling and did not object to the trial court's failure to include such an instruction to the jury. At the end of the hearing the trial

22

court noted that both parties had been given a copy of the jury charges and verdict form and asked Mr. Bryant's counsel if there were any objections from the plaintiff on the jury charges. Mr. Bryant's counsel replied, "no, your honor."

Furthermore, we have reviewed the jury charges given by the trial court, and find no fundamental errors. Therefore, because Mr. Bryant did not object to the giving or failure to give any jury charges at trial, he is precluded from making such a claim on appeal.

## CONCLUSION

For the foregoing reasons, we amend the July 12, 2023 judgment to award Mr. Bryant $1,500.00 for past medical expenses and affirm the judgment as amended. All costs of the appeal are divided equally between plaintiff-appellant, Mr. Michael D. Bryant and defendant-appellee, Helix Energy Solutions, Inc.

**AMENDED, AND AS AMENDED, AFFIRMED.**